**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LARICE NELSON, SHYHEIM HURDE, SAMMIE GAGE, and PARASHUN ROSCOE,** | ) | |
| **Plaintiffs,** | ) | **No. 1:24 C 00641** |
| **v.** | ) | **Judge Rebecca R. Pallmeyer** |
| **CITY OF CHICAGO, a municipal corporation, WILLIAM T. SIERZEGA, QUONTEZ L. HARRINGTON, SCOTT J. PIETRYLA, CARLOS M. MOTA, SERGIO J. QUINTANILLA, JESUS LONGORIA, NICHOLAS J. SCHNEIDER, WILLIAM E. MORAN, JOSEPH RAMIREZ, and UNKNOWN CHICAGO POLICE OFFICERS,** | ) | |
| **Defendants.** | ) | |

# MEMORANDUM OPINION AND ORDER

In the afternoon of January 27, 2022, Plaintiffs Larice Nelson, Shyheim Hurde, Sammie Gage, and Parashun Roscoe were in a vehicle stopped in a marked no-parking zone in Chicago's Magnificent Mile. Officers of the Chicago Police Department ("CPD") approached the parked vehicle, observed that it had an illegally-tinted front windshield, and initiated a traffic stop. When one of the officers approached the vehicle and opened the driver's door, the driver (Plaintiff Sammie Gage) immediately became irate and began shouting and swearing. Additional officers responded to the scene and, noting the smell of cannabis, two of them searched the vehicle. One occupant was arrested on an outstanding warrant, and the other three were allowed to leave, with the driver receiving only minor traffic citations. All four (Gage and his three passengers) now bring this civil-rights lawsuit, pursuant to 42 U.S.C. § 1983, against the City of Chicago and the individual officers. Plaintiffs have alleged that the search and seizure of their vehicle violated the Fourth Amendment to the U.S. Constitution. Both parties have filed cross-motions [51, 54] for summary judgment. As explained below, Defendants' motion is granted.

## BACKGROUND

### I. Factual Background

The facts laid out below are taken from the parties' Local Rule 56.1 statements and body-worn camera video footage of the incident. In construing cross-motions for summary judgment, the court takes disputed facts in the light most favorable to the party "against whom the motion under consideration is made." *Calumet River Fleeting, Inc. v. Int'l Union of Operating Eng'rs, Loc. 150, AFL–CIO*, 824 F.3d 645, 647–48 (7th Cir. 2016). Because this encounter is recorded on officers' body-worn cameras, the court does not credit either party's factual assertions that are flatly contravened by the video evidence. *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

#### A. Traffic Stop

In the late afternoon of January 27, 2022, Plaintiffs Gage, Roscoe, Nelson, and Hurde rode together in Gage's vehicle, a four-door Infiniti with tinted windows on all sides, to downtown Chicago. (PSOF [56] ¶ 11.) They dropped Nelson off at the Louis Vuitton store on Michigan Avenue to pick up a bracelet that he had ordered online. (*Id.*) A receipt confirms that he completed that transaction at 4:50 p.m. (*Id.* ¶ 22.) Nelson then returned to Gage's car, which was stopped on the side of the road at 101 East Walton Street in Chicago, below a no-parking sign. (DSOF [53] ¶ 6.) The parties dispute whether the stop in that area is permitted: Plaintiffs claim that the sign only explicitly prohibits *parking*, but not *standing*, and that Plaintiffs were lawfully standing in that zone because the vehicle's motor was running. A photo of Gage's car, and of the no-parking sign, is reprinted below.[1]

[1] This photo is a still from Officer Quintanilla's body-worn camera footage. (Quintanilla B.W.C. Video at 16:56:44.)



Plaintiffs further claim that the car was stopped in a location designated during the ongoing pandemic for curbside pickup (PSOF [56] ¶ 15); a sign that reads "PICK-UP ZONE. CONTACT STORE UPON ARRIVAL" is visible in the body-worn camera footage several car-lengths ahead of where Plaintiffs' vehicle was stopped, as shown in the photo below.




(*See* Pl. Ex. 12[2] [57-12] (screenshot including curbside pickup sign).) Defendants largely agree with this version of events, but point out that the curbside pickup sign was in front of the Gucci

[2] While the sign is visible in Pl. Ex. 12, it is difficult to read it. Taking facts in the light most favorable to Plaintiffs, the court assumes that it did in fact read "PICK-UP ZONE. CONTACT STORE UPON ARRIVAL." (PSOF [56] ¶ 15.)

store and North Michigan Shops mall, and that Plaintiffs were not arranging for a curbside pickup from either of those locations. (Defs.' Resp. to PSOF [65] ¶ 14.) They also note that the sign is from a "private business," and that only "the City of Chicago's Commissioner of Transportation is authorized to determine places where the standing or parking of vehicles on public streets is and is not allowed." (*Id.*) It is unclear whether the City of Chicago was involved in designating that section of East Walton Street as a curbside pickup zone. The City, despite being a Defendant in this case, has presented no evidence on this issue.

The subsequent events are caught on the officers' body-worn cameras. At roughly 4:56 p.m., CPD Officers Carlos Mota and Sergio Quintanilla turned onto Walton Street, observed Gage's parked car, stopped their police vehicle, and initiated a traffic stop. (Pls.' Resp. to DSOF [70] ¶ 17.) Plaintiffs accuse Mota and Quintanilla of racially profiling them, and claim the officers stopped them for "shopping while Black." (Pl.'s Reply Br. [80] at 2.) Specifically, Plaintiffs claim that Officers Mota and Quintanilla observed Mr. Nelson leave the Louis Vuitton store and get into Gage's vehicle, and then decided to harass him out of racial animus. (*See id.*; PSOF [56] ¶¶ 23–25.) But there is no evidence that the officers were aware of Nelson's presence—or his race—prior to initiating the stop. Nelson does not appear on the dash camera footage from Mota's and Quintanilla's vehicle, so it appears that Nelson had already left the store and returned to the vehicle by the time that the officers turned onto Walton Street and noticed Gage's vehicle. The only evidence that the officers were aware of Nelson's presence is Nelson's deposition testimony, in which he states that he saw a CPD vehicle driving by as he walked back to the vehicle. But that means little, because, as Nelson acknowledges, he did not know whether the cruiser he saw was the one that later stopped him. (Nelson Dep. [53-4] at 95:2–99:17.) And because the car's windows were tinted on all sides, it is not clear that the officers could see the race of the individuals inside Gage's vehicle.

Officers Mota and Quintanilla stopped in front of Gage's car, exited their cruiser, and approached Gage's vehicle. The video's audio begins with Officer Mota verbally expressing his

plan to "talk to them real quick," as he exits the vehicle. (Ex. G, Mota B.W.C. Video at 2:00.) As noted, the car's tinted windows made it difficult (if not impossible) to see the occupants inside. Quintanilla approached the vehicle's passenger side; Roscoe was seated in the front passenger seat, and rolled his window down as Quintanilla approached. (Quintanilla B.W.C. Video at 2:19.) Officer Mota approached the vehicle's driver side, where Mr. Gage was seated. Gage did not roll down the window as Mota approached. (Pls.' Resp. to DSOF [70] ¶ 19.) Mota stated, "I can't see anything," and opened Gage's door. (DSOF [56] ¶ 20.) As he opened the door, Mota told Gage, "Hello, roll down the window for me, sir." (Ex. G, Mota B.W.C. Video at 2:20.) But Gage attempted to close the door, and Mota prevented him from doing so, telling him, "Don't do that, roll down the window." (*Id.* at 2:21.) Mota then turned on his flashlight and shined it in Gage's lap; he said, "you're being stopped right now, roll down the window."[3] (*Id.* at 2:25.)

Gage was immediately antagonistic, angry with Mota for opening his door and for initiating a stop. (Pls.' Resp. to DSOF [70] ¶ 21.) Gage demanded, "What [are] you doing? How are you going to stop a stopped car, bust my window down?" (*Id.* at 2:27.) He asked Mota to turn on his body-worn camera, and Mota responded that it was already on. (*Id.* at 2:28.) Gage then said, "Alright, close my door and let me roll my window down." (*Id.*)

At this time, Officer Quintanilla, standing on the opposite side of the vehicle, instructed Gage to "roll down all your windows," and Gage responded, "he's tweaking, what is he doing," evidently referencing Mota.[4] (Quintanilla B.W.C. Video at 2:30.) Quintanilla observed that Gage's hand was on the car's gear shifter and ordered Gage to remove it. Gage refused, responding, "I

[3] Nelson claimed in his deposition that Mota had his hand on his gun. (PSOF [56] ¶ 28.) It cannot be ascertained from Officer Quintanilla's or Officer Mota's B.W.C. video footage whether this is accurate. (Quintanilla B.W.C Video at 2:10.) The court will assume that Mota had his hand on his gun during this encounter.

[4] Without vouching for its accuracy, the court notes that the Lexistry website explains that "tweaking" means "acting crazy, irrational, or being wrong about something." https://www.lexistry.com/phrase/tweaking (last visited Sept. 1, 2026). Review of the video suggests that word at least as aptly describes the conduct of Plaintiffs Gage and Nelson as that of the officers.

don't have to get my hand off shit." (Ex. G, Mota B.W.C. Footage at 2:38.) He then repeatedly yelled "close my door, close my door" at Mota, and objected to the validity of the stop, arguing that his "car was stopped already." (*Id.*) Mota attempted to speak with Gage while he was yelling, saying "hang on, hang on, hang on," but Gage responded, "hell no," and continued to demand that Mota close his door. Mota declined to do so, and Gage then gave in briefly, saying "alright," while resting his head in his hand. (Quintanilla B.W.C. Video at 2:56.)

Mota then asked the backseat passengers to roll their windows down. The two backseat passengers—Plaintiff Nelson in the back driver's side seat, and Plaintiff Hurde in the back passenger's side seat—complied immediately. (DSOF [53] ¶ 2 (undisputed in relevant part).) Gage requested that Mota call his supervisor, and Mota responded, "I will, give me one moment." (Ex. G, Mota B.W.C. Video at 3:05.) Nelson asked Mota to allow him to roll the window back up due to the cold weather, but Mota declined, pointing out that the windows were tinted and stating, "I like to be able to see into the car and who I'm talking with." (*Id.* at 3:34.) Mota opened the back door, but Nelson immediately slammed it shut and became instantly irate. As the camera footage confirms, he screamed angry insults and profanity at Mota, referring to him as a "faggot-ass bitch" and using the n-word. (*Id.* at 3:48.) By this time, it was around 5:00 p.m.; multiple other CPD officers began to arrive on the scene, including Defendants William T. Sierzega, Quontez L. Harrington, Jesus Longoria, Nicholas J. Schneider, William E. Moran, and Joseph Ramirez. (DSOF [53] ¶¶ 32, 33, 68; Remirez B.W.C. Video at 2:18.) Defendant Scott J. Pietryla arrived on scene at around 5:06 p.m. (DSOF [53] ¶ 56; Pietryla B.W.C. Video at 2:18.) Many of these officers played a very minor role in the subsequent events. For the most part, they remained standing on the sidewalk nearby, watching the stop occur without intervening.

After his interaction with Nelson in the backseat, Mota turned his attention back to Gage in the driver's seat. Mota asked whether Gage wanted to know the reason for the stop, but Gage instead demanded to talk to Mota's sergeant. (Mota B.W.C. Video at 4:05; PSOF [56] ¶ 38.) Mota informed Gage that he had already called his sergeant, and that the sergeant was on his way.

(Ex. G, Mota B.W.C. Footage at 4:07.) Simultaneously, Nelson yelled to an unknown individual, "Hey, come here man, he know us bro, he [Mota] just did this bitch ass shit, I'm fucking shopping bro." (Ex. H, Quintanilla B.W.C. Video at 4:10.) Quintanilla, still on the passenger's side, told Nelson multiple times to "relax," but an unknown CPD officer, now standing beside Quintanilla, started yelling back at Nelson. The officer demanded, "What did you say?" and Nelson retorted, "I'm not talking to you." (*Id.* at 4:15.) The unknown officer then said, "No, and I'm not some fucking shithead that's sitting on a fucking street either so don't talk to me that way." (*Id.* at 4:20.)[5]

As Nelson interacted with the officers, Gage "had his identification card, registration, and insurance in his hand." He claims he would have "given them to the sergeant if he had come over to hear Gage's complaint about how he was being treated." (PSOF [56] ¶ 41.) A sergeant did not approach the car, however. Instead, Mota ordered Gage to exit the vehicle multiple times, and Gage continued to refuse. Eventually, Gage asked Mota why he was stopped, and Mota explained that he had stopped Gage because the vehicle was parked illegally and had illegally tinted windows on all sides. (*Id.* ¶ 42 Ex. G, Mota B.W.C. Footage at 6:37, 6:45.) Mota once again ordered Gage out of the vehicle, and after some further resistance, Gage complied. (*Id.* at 7:44.) Gage was then placed into handcuffs by one of the officers. Gage asked, "Why are you putting my hands behind my back?" Mota replied, "Because of how aggressive you were acting when I initially approached you." (*Id.* at 7:55.) After Gage was handcuffed, Mota asked Roscoe and Hurde to exit the vehicle; both men were largely compliant with the officers, and quickly exited. (*Id.* at 8:25.) Roscoe was handcuffed, but Hurde, whose hands were in the air for most of this encounter, was not restrained. (DSOF [53] ¶ 52.)

---

[5] Neither party knows the identity of this officer. (DSOF [53] ¶ 31.) The dash camera footage from Mota's vehicle shows that officer arriving at the scene of the stop shortly after it began in an unmarked silver sedan. (Ex. F, Dash Camera Footage at 3:00.) He appears to be in partial CPD uniform. (*Id.*) Strangely, this officer drove off in the same sedan shortly after his interaction with Nelson—it appears that he arrived, yelled at Nelson, and left very quickly thereafter. (*Id.* at 4:44.) He has played no other role in this litigation.

At some point prior to being placed in handcuffs (it is not clear from the video exactly when), Gage handed Mota his Illinois state identification card, but not an Illinois driver's license. Mota used this identification card to search Gage's name, and discovered that Gage had a valid driver's license, though he did not have it with him at the time of the stop. (Pl.'s Resp. to DSOF [70] ¶ 35.) In the meantime, several officers, including Officer Sierzega, were interacting with Nelson; he continued to hurl slurs and insults while the officers appeared to remain calm. One officer could be heard during Nelson's tirade, stating (presumably ironically), "spread love." (Ex. N, Sierzega B.W.C. Video at 8:44.)

Sierzega ordered Nelson out of the vehicle. (DSOF [53] ¶ 41 (undisputed in relevant part); Ex. N, Sierzega B.W.C. Video at 3:24.) After Nelson complied, Sierzega pulled Nelson's right arm behind his back and placed handcuffs on Nelson's right wrist; Nelson objected, demanding, "Bro, stop twisting my fucking arm like that." (Ex. N, Sierzega B.W.C. Video at 3:42.) Sierzega pulled Nelson's left arm behind his back, and fastened the handcuffs. (*Id.* at 3:46.) Sierzega told Nelson to relax, and ordered him to move to the rear of the vehicle. (*Id.* at 3:48.) As officers moved him to a position at the rear of the vehicle, Nelson repeatedly jerked physically and continued shouting at the officers, using racial slurs, screaming "I hate you!" and accusing the officers of twisting his arm (it is unclear which arm).[6] (*Id.* at 3:53; 4:26; 5:54.) One officer (it is not clear which one) asked, "Which cuff is tight man?" Nelson responded, "He knows which cuff is tight," gesturing towards Sierzega. (*Id.* at 4:42.) Then, an unknown officer reached towards Nelson's handcuffs—whether in an attempt to adjust the cuffs or merely to determine how tight they were is not clear from the video. (*Id.* at 4:46.) Nelson continued to object to pain from the handcuffs, and roughly one minute later, Officer Harrington appears to have adjusted them using a metal tool. (*Id.* at 5:47; Nelson Dep. [57-2] (noting that the tool was used to loosen the

[6] The court notes that the video appears to show Nelson complaining about pain in his right arm, but Nelson's subsequent hospital visit concerned pain in his left arm. It is unclear whether Nelson claims that his right arm was also injured in this encounter.

handcuffs).) Even after the adjustment, Nelson complained that the cuffs were too tight (they are "still on my [] bone"). (Ex. N, Sierzega B.W.C. Video at 5:51.)

While the officers were engaged with Nelson, Roscoe informed Officer Quintanilla that because Nelson's "neck [is] broke" he has difficulty putting his hands behind his back. (DSOF [53] ¶ 44; Pl.'s Resp. to DSOF [70] ¶ 44.) Nelson indeed suffered a neck injury in 2016—while running from gunfire, he collided with a tree, causing several vertebrae to become misaligned; what ongoing difficulty, if any, he had at the time of this 2022 incident is not clear. (Nelson Decl. [57-1] ¶ 29.) After learning of Nelson's injury, Quintanilla attempted to verbally inform the officers arguing with Nelson, but the other officers did not acknowledge Quintanilla's statement—it is not clear if they heard him. (Pl.'s Resp. to DSOF [70] ¶ 44.) Nelson himself did not immediately inform the officers about the injury; instead, he argued with the officers about various other things. About two minutes after he was first handcuffed, Nelson finally told the officers that he has a "fucked up nerve or something" in his neck and has difficulty with handcuffs.[7] (Ex. N, Sierzega B.W.C. Video at 6:02.) The officers did not adjust his handcuffs or do anything else in response. Instead, they continued standing at the rear of the vehicle, holding Nelson's arm. For several minutes, Nelson continued berating the officers, using racial and sexual slurs, and announcing, "I hate you!" (*Id*. at 8:32.)

After all passengers had exited the vehicle, Officers Mota and Quintanilla searched it. They claim that they smelled "burnt cannabis" in the vehicle (DSOF [53] ¶¶ 26), and that they observed what they believed to be loose cannabis leaves on the floorboard of the vehicle. They also claim that they observed packages of "Backwoods" cigars in the car—these cigars, according to Defendants, are commonly used as "paper[]" by cannabis smokers to roll marijuana. (*Id.* ¶ 24.) A package of Backwoods cigars in the car is clearly visible on Officer Mota's body-worn camera

---

[7] Nelson acknowledged during his deposition testimony that no doctor had warned him not to put his arms behind his back. He states it is "just something that I know about my body. I know what hurts in my body." (Nelson Dep. [57-2] at 89:15–18.)

footage. (Mota B.W.C. Video at 2:29.) The officers extensively searched the car but located no cannabis or other contraband. (DSOF [53] ¶ 55; Pl.'s Resp. to DSOF [70] ¶ 55.)

After the search, the officers removed Plaintiffs' handcuffs and allowed each of them to return to their vehicle. After Nelson's hands were free, he continued his verbal tirade.[8] (*E.g.*, Ex. N, Sierzega B.W.C. Video at 9:40.) Officer Mota wrote three traffic citations for Gage, including (1) parking in a tow zone, (2) failure to produce a valid driver's license, and (3) improper tint on the vehicle's windshield. (DSOF [53] ¶ 61.) As Gage's citations were being processed, Officer Quintanilla determined (evidently via his police cruiser's computer) that there was an active warrant for the arrest of Hurde on an earlier DUI charge. (*Id.* ¶ 59.) Quintanilla and Mota returned to the vehicle, and took Hurde into custody. (Ex. H, Quintanilla B.W.C. Footage at 18:09.) Nelson loudly challenged at least one officer to a fight. (Ex. N, Sierzega B.W.C. Footage at 14:49.) Plaintiffs Nelson, Gage, and Roscoe were allowed to leave at approximately 5:28 p.m.[9] (DSOF [53] ¶ 63), less than 40 minutes after Nelson completed his transaction at the Louis Vuitton store.

### B. Nelson's Injuries

Nelson claims that he was injured as a result of the incident. He has submitted an undated photograph of his wrists, evidently taken soon after the traffic stop, showing minor redness and swelling. (Pl. Ex. 21 [57-21] (photographs of wrist injury).) He also claims that he suffered an injury to his left shoulder. The day after the traffic stop, he flew to Las Vegas for a planned vacation with his girlfriend, but his trip was ruined because he was "stuck in . . . bed" due to severe

---

[8] In addition to referring to various officers as "faggots," he yelled insults and derogatory references to the officers' sexual activity. (Ex. N, Sierzega B.W.C. Footage at 11:26.)

[9] Defendants' LR 56.1 statement asserts that the stop ended at 5:28 p.m. (DSOF [53] ¶ 63.) This statement is consistent with the body-worn camera footage: while not conclusive, it shows the officers returning to their car (evidently to depart) at roughly 5:27 p.m. (Ex. H, Quintanilla B.W.C. Footage at 32:40.) In their LR 56.1 response, Plaintiffs dispute that the stop ended at 5:28 p.m. (Pls.' Resp. [70] ¶ 63) but they offer no evidence in support of this purported dispute.

shoulder pain. (Nelson Dep. [57-2] at 148:6–11, 148:14–16.) He claims that neither he nor his girlfriend did much of anything during the trip due to the severity of the pain. (*Id.* at 149:9–150:6.)

After returning to Chicago, Nelson went to the Rush Oak Park Hospital Emergency Department on February 1, 2022, for shoulder pain. (*Id.* at 150:20–21.) The emergency medicine provider observed that Nelson's left shoulder was tender with reduced range of motion, but found no observable "swelling, deformity or crepitus." (Medical Records [57-20] at 6.) The provider determined that Mr. Nelson did not require emergency care, and directed him to follow up with his primary-care physician and with orthopedics to rule out a rotator cuff tear, capsulitis, or shoulder impingement.[10] (*Id.* at 7.) Nelson has submitted an affidavit claiming that he later received care for "chronic left shoulder pain and restricted movement due to rotator cuff injury and adhesive capsulitis (inflammation and scarring)," but he does not describe that treatment, nor does he say whether he was diagnosed with any injury. (Nelson Aff. [57-1] ¶ 34.) Nelson's affidavit does not include a citation to the record, and medical records from his follow-up appointments do not appear to be in the summary judgment record.[11] During his deposition, Nelson claimed that an MRI showed cysts and arthritis in his shoulder, and that he had been referred to physical therapy. (Nelson Dep. [57-2] at 179:8–24.) Records of the MRI and physical therapy are also absent from the record.

This lawsuit followed.

---

[10] Plaintiff's Local Rule 56.1 statement states that Mr. Nelson's pain "was diagnosed as due to a possible rotator cuff tear or shoulder impingement." (PSOAF [71] ¶ 41.) But that characterization is not supported by the cited records. The records state only that emergency care was not necessary, and that follow-up with a primary care physician was recommended to rule out a more serious shoulder injury. (Medical Records [57-20] at 7.) Shoulder strain is the only diagnosis listed in Mr. Nelson's medical records from the E.D. visit. (*Id.* at 1.)

[11] Mr. Nelson testified that he "believe[d]" that he provided copies of those results to his attorney. (*See* Nelson Dep. [57-2] at 157:3–5.) Further, Plaintiffs' counsel claims that "some" of these records were produced during discovery, and that more "are forthcoming." (Pls'. Resp. to DSOF [70] ¶ 77.) Counsel does not explain why the records were not submitted as part of the summary judgment record.

## II. Procedural Background

On January 24, 2024, Plaintiffs filed a seven-count complaint [1]. The claims include Count I: illegal stop; Count II: illegal detention; Count III: excessive force against Plaintiff Nelson; Count IV: excessive force against Plaintiffs Hurde, Gage, and Roscoe; Count V: illegal search of the vehicle; Count VI: illegal search of the person; and Count VII: indemnification. The parties filed cross-motions for summary judgment, and Plaintiffs withdrew Counts IV and VI [72]. All motions are now fully briefed.

## LEGAL STANDARD

Summary judgment is appropriate if "there is 'no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Christensen v. Weiss*, 145 F.4th 743, 751 (7th Cir. 2025); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A genuine issue of material fact exists only if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Doxtator v. O'Brien*, 39 F.4th 852, 860 (7th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)). In considering cross-motions for summary judgment, the court construes the record in "the light most favorable" to the nonmoving party. *Echevarria v. Jackson*, 178 F.4th 408, 413 (7th Cir. 2026). The court does not "make credibility determinations" or otherwise weigh the evidence. *See Jackson v. City of Madison*, 176 F.4th 1005, 1015 (7th Cir. 2026) (citing *McCottrell v. White*, 933 F.3d 651, 655 (7th Cir. 2019)).

Summary judgment is the "put up or shut up moment in litigation." *See Brown v. Chicago Transit Auth.*, 179 F.4th 577, 586 (7th Cir. 2026) (cleaned up). It requires the opposing party to "set forth specific facts showing a genuine issue for trial." *Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). To survive, the nonmovant must produce affirmative evidence supporting a jury finding in their favor; while the court must give the nonmovant "the benefit of reasonable inferences from

the evidence," the court may not make "speculative inferences." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (citation omitted).

**DISCUSSION**

Plaintiffs allege that Defendants' conduct during the traffic stop violated the Fourth Amendment. Their claims generally fit into three categories: unlawful seizure, unlawful search, and excessive force. The court considers each in turn.

**I. Unlawful Seizure**

**A. Validity of Traffic Stop**

First, Plaintiffs claim that Defendants' decision to initiate a traffic stop was an unreasonable seizure in violation of the Fourth Amendment. (*E.g.*, Pl. Opp'n [69] at 3.)

The Fourth Amendment provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST., amend. IV. Traffic stops are seizures, so they must be objectively "reasonable" under the "totality of the circumstances." *See United States v. Cole*, 21 F.4th 421, 427 (7th Cir. 2021) (en banc) (citations and internal quotation marks omitted). Because traffic stops are "typically brief detentions," they "require only reasonable suspicion of a traffic violation—not probable cause." *Id.* If a police officer sees a driver committing a traffic violation, even a minor one, reasonable suspicion for that stop exists. *See United States v. Smith*, 32 F.4th 638, 641 (7th Cir. 2022). "If an officer reasonably thinks he sees a driver commit a traffic infraction, that is a sufficient to pull him over without violating the Constitution." *United States v. Simon*, 937 F.3d 820, 829 (7th Cir. 2019).

There is no valid dispute on this issue. An Illinois state statute makes it unlawful to drive "a motor vehicle with . . . tinted film upon the front windshield . . . [unless] such material does not extend more than 6 inches down from the top of the windshield." 625 ILL. COMP. STAT. 5/12-503(a). Plaintiffs acknowledge that Gage's front windshield was fully tinted, and the tint is clearly visible on the officers' body-worn camera footage. (*E.g.*, Pls. Resp. to DSOAF [81] ¶ 4.) This

gave the officers a basis to conduct a traffic stop, even if the offense itself was merely a "minor traffic infraction."[12] *United States v. Jackson*, 962 F.3d 353, 357 (7th Cir. 2020).

Plaintiffs' primary counterargument is focused on state law: They contend that Illinois law establishes that having a tinted windshield is a "petty offense" that warrants the issuance of a citation, not a full-blown traffic stop. (Pl. Opp'n [69] at 8.) Plaintiffs claim that the officers should have "walked over to the vehicle and affixed [a] notice to the vehicle in a conspicuous place" without interacting with the vehicle's occupants, and that their decision to do so violates Illinois law.[13] (*Id.* at 5, 8; Pl. M.S.J. [55] at 4–6.) Even assuming *arguendo* that Plaintiffs' characterization of Illinois law is accurate, this argument is misplaced. Section 1983 is used to remedy violations of federal law, not state law. *See Baker v. McCollan*, 443 U.S. 137, 146 (1979). State law is of course relevant—it informs whether a crime was committed, and thus whether reasonable suspicion for a stop exists—but officers' violations of state laws governing police activities do not transform a stop supported by reasonable suspicion into a constitutional violation. The Supreme Court case *Virginia v. Moore*, 553 U.S. 164 (2008), is on point here. Virginia police officers stopped David Moore for driving on a suspended license. State law directed issuance of a citation

[12] Plaintiffs also appeared to be parked illegally. Chicago Municipal Code § 9-64-150(b) provides that it is unlawful to "stand or park any vehicle in violation of any sign erected." Because Gage was stopped under a no-parking sign with the vehicle's lights off, he appeared to be parked from the officers' perspective. Because parking violations are civil offenses under the Chicago Municipal Code, *see id.* § 9-64-230, it is unclear whether they can give rise to the reasonable suspicion necessary for a traffic stop. The court need not address this question, because the tinted windshield independently supplied the reasonable suspicion necessary for the stop.

[13] Plaintiffs also argue that Chicago's tinted windshield ordinance violates the Illinois State Constitution. (Pl. Opp'n [69] at 9.) The court declines to review the ordinance for congruity with the Illinois Constitution but notes that such a challenge was unsuccessful in *Ray v. City of Chicago*, 2012 IL App (1st) 111284-U, 2012 WL 6955449. Plaintiffs assert that the ordinance was repealed on November 7, 2022 (Pl. Opp'n [69] at 9), but that post-dates the incident at issue in this case. City ordinance aside, dark tinted windows violate the Illinois Vehicle Code. 625 ILL. COMP. STAT. 5/12-503. *See United States v. Wiley*, ___ F.4th ___, 2026 WL 2266906 (7th Cir. Aug. 6, 2026) (affirming denial of a motion to suppress evidence found in a warrantless search; excessive tint alone provided law enforcement officers with reasonable suspicion to stop the defendant).

in these circumstances; instead, the officers arrested him. On appeal, the Supreme Court found that this arrest did not run afoul of the Fourth Amendment. The Court noted that while Virginia can choose to regulate police activities above and beyond what the Fourth Amendment requires, the Fourth Amendment standard is a national one, and is not modified by the law of the local state. *Id.* at 176 ("[W]hile States are free to regulate such arrests however they desire, state restrictions do not alter the Fourth Amendment's protections."). The same principle applies here. The tinted windshield provided reasonable suspicion for a stop, so the Constitution was not violated. Whatever remedy or defenses Plaintiffs might have under state law, they cannot pursue a remedy "under the United States Constitution." *Baker*, 443 U.S. at 144.

Plaintiffs spill significant ink litigating the semantic distinction between "standing" and "parking." (Pl. M.S.J. [55] at 3–5; Pl. Opp'n [69] at 7.) They contend that Gage was merely "standing" because the car was occupied while stopped, and thus he did not violate any local ordinance prohibiting parking. (Pl. Reply [80] at 3–6.) Likewise, they argue that Gage's citation for a tinted windshield was improper because the officers lacked a "tint meter" to determine the precise level of tint in Plaintiffs' windshield. (Pl. M.S.J. [55] at 8.)

Neither argument is availing. Again, for Fourth Amendment purposes, the relevant question is whether or not the officers had a reasonable suspicion that a crime was being (or had been) committed, not whether the officers were ultimately correct about the factual basis for the stop. *See Cole*, 21 F.4th at 428 ("The question . . . is whether Trooper Chapman reasonably believed that he saw a traffic violation, not whether Cole actually violated the statute."). From the officers' perspective, the car was parked, without its hazard lights on, in a no-parking zone, with no visible occupants inside. The officers observed that the front windshield was tinted. They were free to initiate a stop in response to these facts. Plaintiffs might indeed be correct that they were ultimately not guilty of the various petty offenses they were charged with, and a state court handling their case might be convinced by their interpretation of the Chicago parking ordinance or Illinois state law. But neither of those facts renders the officers' conduct a constitutional

violation.[14] *See Simon*, 937 F.3d at 829 ("If an officer reasonably thinks he sees a driver commit a traffic infraction, that is a sufficient basis to pull him over without violating the Constitution.").

**B. Prolonged Detention**

Plaintiffs also argue that the "stop and detention for a parking ticket and a minor equipment violation was unconstitutionally prolonged" in violation of the Fourth Amendment. (Pl. Opp'n [69] at 13 (cleaned up).) A traffic stop is unlawfully prolonged if it lasts "longer than is necessary" to address the infraction at issue; "[a]uthority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). The "ordinary inquiries incident to a traffic stop" typically involve "checking the driver's license, determining whether there are outstanding warrants against the driver, . . . inspecting the automobile's registration and proof of insurance," and similar matters. *Cole*, 21 F.4th at 428–29. Conduct that strays from this general mission falls outside the Fourth Amendment's tolerance. *See United States v. Sykes*, 578 F. Supp. 3d 978, 982 (N.D. Ill. 2022) ("These inquiries serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." (cleaned up)).

This traffic stop was not prolonged. It lasted approximately thirty minutes, and the video footage makes clear that delays in the stop's completion were the result of Gage and Nelson's own actions: their demands for a supervisor; refusal to comply with valid orders given by police officers; repeated decision to argue, berate, and demean various officers; and request for a receipt following the completion of the stop. *See Cady v. Sheahan*, 467 F.3d 1057, 1063 (7th Cir. 2006) ("When delay is attributable to the evasive actions of a suspect, the police do not exceed the permissible duration of an investigatory stop."). While it is true that Hurde and Roscoe were

[14] Plaintiffs also take issue with the fact that Mr. Gage received a citation for driving without a license; they argue that the Illinois statute requiring drivers to carry "one's license physically in one's possession" makes "no sense and is mean-spirited" in the digital era. (Pl. Opp'n [69] at 13.) Whatever the policy merits of this argument might be, there is no basis for holding Defendants personally liable under § 1983 for enforcing the State of Illinois's traffic laws, even if those traffic laws "make[] no sense" to Plaintiffs. (*See id.*)

cooperative throughout the stop and did not impede its completion, it was the actions of their co-plaintiffs—not the involved officers—that caused this stop to take longer than it should have. There is no evidence suggesting that officers delayed the completion of the stop for dilatory purposes, or that they detoured from the initial purpose of the stop. To the contrary, the body camera footage shows that the officers generally remained focused on the task at hand throughout the encounter. True, the officers' decision to search the vehicle did technically prolong the detention, but that decision does not support a prolonged-detention claim because the search was relatively brief and was supported by probable cause (as explained below).

Plaintiffs have also suggested that Defendants unlawfully prolonged the stop out of retaliation for Defendants' speech—namely, their use of profanity and slurs to refer to various police officers. (Pl. M.S.J. [55] at 11–12.) This argument requires only brief discussion. Plaintiffs are correct that slurs and hate speech, however ugly and offensive, are protected by the First Amendment. *See Matal v. Tam*, 582 U.S. 218, 246 (2017); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 395–96 (1992). Likewise, verbally criticizing the activities of police officers during a traffic stop is constitutionally protected activity. *City of Houston, Texas v. Hill*, 482 U.S. 451, 461–63 (1987). Plaintiffs have not asserted a First Amendment claim, however, and as explained earlier, there is no evidence that the stop was prolonged by Defendants at all, much less in retaliation for Plaintiffs' protected speech.

**C. Qualified Immunity**

If the court were to find that the officers' decision to initiate a stop, or the length of said stop, violated the Fourth Amendment, Defendants would be shielded from liability under the doctrine of qualified immunity.

"Although qualified immunity is an affirmative defense, the plaintiff has the burden of defeating it once the defendants raise it." *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017). To overcome qualified immunity, Plaintiffs must demonstrate not only (1) that the facts, when viewed in the light most favorable to them, establish a violation of their constitutional rights, but

also (2) that Defendants' conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known" at the time. *Gaddis v. DeMattei*, 30 F.4th 625, 632 (7th Cir. 2022) (internal citations omitted). To satisfy the second prong of the qualified immunity analysis, Plaintiffs must "point to cases establishing a rule" that would make Defendants' liability "obvious" at the time of the alleged violation; the case need not be "directly on point," but Plaintiffs may not "rest on generalities." *Id*. (internal citations omitted). As the Seventh Circuit has emphasized, "[t]his precision is particularly important in the context of the Fourth Amendment," where it is "sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Id*. (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)).

Defendants raised qualified immunity in their opening brief in this case (Defs. MSJ [62] at 18.), but Plaintiffs make little effort to defeat it. They cite only two cases: *United States v. Green*, 111 F.3d 515, 520 n. 1 (7th Cir. 1997) and *United States v. King*, 332 F. App'x 334 (7th Cir. June 16, 2009). (Pl. Opp'n [69] at 17–19.) Plaintiff's reasons for citing these cases are not clear, as their submissions make no effort to analogize the facts or explain why their holdings defeat qualified immunity. Plaintiffs appear to cite *Green* for the proposition that the traffic stop at issue in this case qualified as a seizure, but whether the stop was a seizure says little about whether the seizure was reasonable, and the facts of *Green* bear no obvious resemblance to this case. *See Green*, 111 F.3d at 519–20 (invalidating traffic stop where the "only specific and objective fact the government points to justifying the stop" is that the officer previously saw the car parked outside the home of a suspected criminal). Plaintiffs appear to cite *King* for the proposition that "[a] desire to 'determine if vehicle is occupied [sic],' not based on any specific, articulable reasons to believe that the occupants of the vehicle are armed and dangerous, is unconstitutional." (Pl. Opp'n [19] at 19 (ostensibly quoting *King*, 332 F. App'x at 334).) But *King* does not stand for that principle, and the specific quoted language appears nowhere in the case. In *King*, the Court of Appeals affirmed the trial court's denial of a suppression motion, holding that a police officer was

justified in opening the door of a suspect's car to conduct a "limited, protective search for an accessible weapon." 332 F. App'x at 337. It is unclear how a case that affirms the constitutionality of an officers' *search* would put officers on notice that a particular *seizure* violated the Fourth Amendment.

Plaintiffs' primary argument on qualified immunity is a challenge to the validity of the doctrine more generally. Relying on academic commentary and recent dissenting opinions from Justice Thomas and Justice Sotomayor, Plaintiffs invite the court to set aside the binding precedent on qualified immunity because "the whole body of qualified immunity is based on a textual error." (Pl. Opp'n [69] at 17 (cleaned up).) Whatever Plaintiffs may believe about the merits of the qualified immunity defense, this court obviously has no authority to set it aside.

Ultimately, Plaintiffs bear the burden of pointing to "existing precedent that puts the statutory or constitutional question beyond debate." *Smith v. Kind*, 140 F.4th 359, 365 (7th Cir. 2025) (internal quotation marks and citation omitted). They have not done so. Summary judgment is granted on Counts I and II.

## II. Excessive Force

Next, Plaintiff Nelson claims that the officers used excessive force in handcuffing him, in violation of the Fourth Amendment. (Pl. Opp'n [69] at 23.) Such a claim is analyzed under the "objective reasonableness" standard of *Graham v. Connor*, 490 U.S. 386, 388 (1989). The *Graham* inquiry requires "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests," such as officer safety. *Id*. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)) (quotations omitted). The court must weigh the totality of the circumstances, including the severity of the crime, the "actions the officer took during the stop," any warnings that were given, and the "stopped person's conduct." *Barnes v. Felix*, 605 U.S. 73, 76, 80 (2025). As the Seventh Circuit has explained, excessive force is generally a question of law; while the courts must "defer to a jury's determination of what occurred during an arrest or whose testimony is credible," objective

reasonableness of force is a "legal determination" for the court. *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 520 (7th Cir. 2012); *see also Dockery v. Blackburn*, 911 F.3d 458, 466 (7th Cir. 2018) (recognizing that excessive force is a "pure legal question" in light of a "video recording, which captured the entire episode").

The court concludes that the force utilized here was reasonable as a matter of law. The entire encounter is captured on the body-worn cameras of multiple police officers, from multiple different angles. The footage shows that from the instant Officer Mota first spoke to him, Nelson was enraged, loud, and belligerent. He refused to comply with lawful orders, yelled at and loudly threatened the officers, and attempted to impede officers' attempts to see into the vehicle. His irrationally furious response to the officers generated reasonable safety concerns. Those concerns justified temporarily placing Nelson in handcuffs. *See United States v. Chavez*, 625 F. Supp. 3d 760, 771 (N.D. Ill. 2022) (holding that an officer's safety concerns justified her handcuffing of a detainee during a traffic stop). Placing Nelson in handcuffs may have been unnecessary in hindsight—perhaps Nelson's previous neck injury (initially unknown to the officers) would have kept him from engaging in any physical aggression—but the use of handcuffs did not violate the Constitution. *Cf. United States v. Carlisle*, 614 F.3d 750, 756 (7th Cir. 2010) ("While handcuffing is not a normal part of a *Terry* stop, it does not automatically turn a *Terry* stop into an unlawful arrest.").

Nelson claims the handcuffs were too tight; relying primarily on *Rooni v. Biser*, 742 F.3d 737 (7th Cir. 2014) and *Payne v. Pauley*, 337 F.3d 767 (7th Cir. 2003), he claims the tightness of the handcuffs violated the Fourth Amendment. But aside from Nelson's deposition testimony and his complaints of pain during the encounter, there is no indication the handcuffs were overly tight. "[T]he fact that a detainee complains of pain does not itself create a triable issue of fact in an excessive force case." *Bass v. Dakuras,* No. 19 CV 7557, 2023 WL 5580416, at *10 (N.D. Ill. Aug. 29, 2023). Moreover, the video footage shows that officers responded to Nelson's complaints of pain: one (unknown) officer asked Nelson which cuff was too tight, but Nelson

refused to answer. A few minutes later, Officer Harrington used a tool on the handcuffs, presumably in an effort to make Nelson more comfortable.

Further, even taking Nelson at his word that the handcuffs were uncomfortably (or even painfully) tight, there is no indication that they were tight enough to constitute a Fourth Amendment violation. Plaintiffs are correct that the Seventh Circuit has found overly tight handcuffing to constitute unconstitutionally excessive force on several occasions, but those cases involve extreme circumstances, evidence of gratuitous force, or lasting injury, none of which are present here. In *Pauley*, for example, the Seventh Circuit reversed summary judgment for officers who had jostled the plaintiff for approximately thirty minutes, handcuffed her so tightly that she lost feeling in her hands, and caused her to develop carpal tunnel syndrome. 337 F.3d at 774–75, 781. In *Rooni*, the plaintiff was involved in an altercation with a game warden who spit a piece of hot dog at the plaintiff, struck him multiple times, handcuffed him, and purposefully twisted the handcuffs to cause pain. 742 F.3d at 738–40. There was evidence that the plaintiff experienced several days of swelling and developed carpal tunnel syndrome. *Id.* at 740. The Seventh Circuit found it "possible" that this constituted excessive force, but declined to "hold this definitively" because the warden was entitled to qualified immunity. *Id.* at 743. And in *Herzog v. Village of Winnetka*, 309 F.3d 1041 (7th Cir. 2002), the Seventh Circuit found that a plaintiff was entitled to a trial on her excessive force claim based on evidence that officers shoved her to the ground, cracked her tooth by shoving a breathalyzer into her mouth, kept her in overly tight handcuffs for over an hour, and laughed when she complained of pain. *Id.* at 1042–43.

This case differs. Defendants' use of handcuffs was not part of a broader pattern of excessive force; Nelson exited the vehicle at the officers' direction, was handcuffed, stood behind his vehicle while a police officer held his arm, and was then released. In total, he was handcuffed for approximately five minutes, and suffered only minor wrist redness and swelling following the incident. The facts here are closer to *Tibbs v. City of Chicago*, 469 F.3d 661 (7th Cir. 2006), where the plaintiff was placed in handcuffs; he complained to an officer about their tightness

"without elaborating on any injury, numbness, or degree of pain," and was kept in handcuffs for approximately "twenty-five to thirty minutes." *Id.* at 666. He then "experienced redness on his wrists for less than two days" and did not seek or receive "medical care for any alleged wrist injury." *Id.* The Court of Appeals, characterizing these allegations as "mild," affirmed the district court's grant of summary judgment in the officers' favor. *Id.* The incident involving Nelson, too, was mild. No reasonable jury could find that the officers' use of handcuffs violated the Fourth Amendment. *See Peirick v. Dudek*, No. 20 CV 3013, 2022 WL 3226965, at *6–7 (N.D. Ill. Aug. 10, 2022) ("[T]o defeat summary judgment, a plaintiff must do more than rely on discomfort and pain from tight handcuffs."); *Smith v. City of Chicago*, No. 21-cv-890, 2026 WL 113675, at *5 (N.D. Ill. Jan. 15, 2026) (granting in part summary judgment in officers' favor where the plaintiff "suffered abrasions" and sore wrists, but identified "no other injuries and testified that he never sought medical care after the incident").

Finally, Nelson claims that he suffered a shoulder injury from the incident, allegedly from the officers moving his hands behind his back to handcuff him.[15] But aside from Nelson's own affidavit, the only evidence concerning Nelson's shoulder are records from his emergency department visit. (Medical Records [57-20].) These records do not support a claim of any serious shoulder injury: They state that he complained of limited range of motion in his shoulder "due to pain," but do not conclusively diagnose any injury other than a sprain. (*Id.* at 2, 8–11.) And the provider noted there was no swelling, deformity, or bony tenderness during his visit. (*Id.* at 11.) While Nelson's affidavit claims that he later sought follow-up care from an orthopedic provider, records of these alleged follow-up visits are absent from the summary judgment record. This evidence establishes that Nelson *sought* follow-up care, but not that the officers must have used

[15] Defendants present evidence that Mr. Nelson lied during his interview with Chicago's Civilian Office of Police Accountability ("COPA"), and made "multiple false accusations against Defendant Officers." (DSOF [53] ¶ 78.) No matter. At summary judgment, the court may not make assessments about the credibility of witnesses.

excessive force. Most importantly, however, the entire encounter here was caught on video from multiple angles, and each shows that the officers used a moderate and objectively reasonable amount of force in placing Mr. Nelson's hands behind his back while he was detained. The court takes Mr. Nelson at his word that he suffered shoulder pain following the incident. But that fact alone does not suggest that a constitutional violation took place.

Summary judgment is granted in favor of Defendants on Count III.

## III. Unlawful Search

Count V of Plaintiffs' complaint alleges that officers violated the Fourth Amendment via their search of Defendants' vehicle.[16] To advance to trial on their unreasonable search claim, Plaintiffs must show that a search occurred, and that the search was unreasonable. *Hess v. Garcia*, 72 F.4th 753, 761 (7th Cir. 2023). A search occurs "when the government violates a subjective expectation of privacy that society recognizes as reasonable." *United States v. Scott*, 731 F.3d 659, 663 (7th Cir. 2013) (quoting *Kyllo v. United States*, 533 U.S. 27, 33 (2001)). While warrants are typically required for searches, there is an exception for automobiles: Because vehicles are, by their very nature, easy to move from one place to another, "officers may search an automobile without having obtained a warrant so long as they have probable cause to do so." *Collins v. Virginia*, 584 U.S. 586, 592 (2018). Probable cause for a vehicle search exists whenever "there is a fair probability that contraband or evidence of a crime will be found" inside the car. *United States v. Eymann*, 962 F.3d 273, 286 (7th Cir. 2020) (citation and internal quotation marks omitted).

---

[16] According to the complaint, the unlawful vehicle search claim is brought by all four Plaintiffs. (Compl. [1] ¶¶ 57–61.) Gage, the driver (and presumably the owner) of the vehicle, certainly has standing to bring such a claim. It is less clear, however, that the other plaintiffs have standing to challenge the vehicle search, as they do not appear to have any kind of possessory interest in the vehicle. *See Rakas v. Illinois*, 439 U.S. 128, 148 (1978) (requiring a "property" or "possessory interest" in either the vehicle or the property searched to bring a Fourth Amendment challenge). The parties do not raise this issue, and because "Fourth Amendment standing is not jurisdictional," the court need not address it here. *United States v. Ostrum*, 99 F.4th 999, 1004 (7th Cir. 2024) (internal quotation marks omitted); *see also Byrd v. United States*, 584 U.S. 395, 410–11 (2018) (distinguishing between Fourth Amendment standing and Article III standing).

Plaintiffs premise their unlawful search claim on two allegedly unconstitutional searches: (1) Officer Mota's opening of Defendants' vehicle door without their consent (Pl. Opp'n [69] at 18–19), and (2) the officers' subsequent decision to search the entire vehicle (*id.* at 19–20).

**A. Opening of the Car Door**

As noted above, at the inception of the stop, Officer Mota approached the driver's side of the vehicle, stated verbally that he could not see inside, pulled the door open, and asked Mr. Gage to roll down the window. Immediately, a verbal altercation ensued, and Officer Mota then refused to close the vehicle door. Plaintiffs allege Mota's opening of the door constitutes an unreasonable search. (*Id.* at 18.)

The court is skeptical. As the Supreme Court held decades ago in *Michigan v. Long*, police officers may conduct a protective sweep of a vehicle's passenger compartment during a traffic stop if they "have a reasonable belief that the suspect poses a danger." 463 U.S. 1032, 1049 (1983); *see also United States v. Erving*, 164 F.4th 953, 961–62 (7th Cir. 2026) ("[A] protective search of a vehicle is permissible if officers have reasonable suspicion to believe: (1) 'the suspect is dangerous' and (2) the suspect 'may gain immediate control of weapons.'" (citations omitted)). The officers have not identified any basis for believing that Plaintiffs were armed or dangerous, but the video footage shows that officers could barely see through the vehicle's illegally tinted windows to see the occupants inside or their activities. Opening the car door in these circumstances may thus be authorized by the *Long* exception, as it is understandable that a police officer would want to visualize the vehicle's passenger compartment in such circumstances. *See United States v. Holifield*, 956 F.2d 665, 668 (7th Cir. 1992) ("The car's tinted windows, which prevented the officers from observing activities inside the car, also added to the officers' reasonable concern for their safety . . . ."); *People v. Hagen*, 191 Ill. App. 3d 265, 267, 138 Ill. Dec. 410, 412, 547 N.E. 2d 577, 579 (4th Dist. 1989) ("Tinted windows prevent law officers from perceiving any dangers or problems inside the vehicle.").

The court need not devote further time to this question, because the officers are entitled to qualified immunity. *See Kemp v. Liebel*, 877 F.3d 346, 350–51 (7th Cir. 2017) (noting that district courts can examine whether qualified immunity is due without reaching a definitive conclusion on whether a constitutional right was violated). As noted above, the doctrine of qualified immunity functions to protect police officers from personal liability for good-faith mistakes made while performing their official duties. *Reed v. Palmer*, 906 F.3d 540, 546 (7th Cir. 2018) ("Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." (citation omitted)). Defendants have raised the defense with respect to the unlawful search claim, and again, Plaintiffs have not made a serious effort to defeat it. The only remotely analogous case cited by Plaintiffs is *United States v. King*, 332 F. App'x 334 (7th Cir. June 16, 2009). (Pl. Opp'n [69] at 17–19, 22–23.) That case, like this one, involved a police officer who opened a door during a traffic stop—but it is of no help to Plaintiffs in overcoming qualified immunity because the Seventh Circuit held there that the conduct did not violate the Fourth Amendment at all. 332 F. App'x at 336–37.

**B. Vehicle Search**

Plaintiffs also take issue with Officer Mota and Officer Quintanilla's search of Gage's car. Defendants argue that they were justified in searching the car because they smelled cannabis coming from the vehicle. Plaintiffs respond that the "the smell of burnt cannabis is not a crime," because cannabis "that is burnt is consumed and no longer exists." (Pl. Opp'n [69] at 20.) Indeed, recreational cannabis use is decriminalized in Illinois, but state law requires that cannabis transported in a private vehicle be enclosed in a secure and "odor-proof" container. 625 ILL. COMP. STAT. 5/11-502.15. It also restricts the use of cannabis while driving. 625 ILL. COMP. STAT. 5/11-501(a)(7). The smell of cannabis in a car, burnt or not, thus suggests that a crime was committed, giving the officers probable cause to search the vehicle. *See United States v.*

*Jackson*, 103 F.4th 483, 488 (7th Cir. 2024) ("The smell of marijuana alone justifies a Fourth Amendment search or seizure.") (collecting cases).

It appears, in any event, that Defendants are entitled to qualified immunity on this claim, as well. The only case cited by Plaintiffs in opposition to Defendants' invocation of immunity is *People v. Hill*, 2020 IL 124595, 162 N.E. 3d 260, 443 Ill.Dec. 626 (2020), a case from the Illinois Supreme Court. Assuming that a single case can supply the "clearly established law" necessary to defeat qualified immunity, the *Hill* case does Plaintiffs no favors. The case was decided in 2020, shortly after Illinois legalized cannabis; Charles Hill's car was searched by a police officer after he smelled cannabis and noticed a "bud" in the car's backseat. *Id.* at 263. On appeal, Hill argued that the officer did not have cause to search his car, given the state's decriminalization of cannabis. He asked the Illinois Supreme Court to overturn its holding in *People v. Stout*, 106 Ill. 2d 77, 87, 87 Ill.Dec. 521, 525, 477 N.E.2d 498, 502 (1985), that "the odor of burnt cannabis without other corroborating evidence provides an officer probable cause to search a vehicle." *Hill*, 162 N.E. 3d at 264. The *Hill* court expressly declined to overrule *Stout*, and instead decided Hill's case on other grounds. *Id.* at 631 ("Because the record shows more than the odor of raw cannabis was considered, we need not address the validity of *Stout* . . . ."). Considering that the *Stout* court did not consider the constitutionality of the practice at issue in this case, it plainly does not defeat qualified immunity. As Plaintiffs point out, the Illinois Supreme Court later did overturn *Stout* in *People v. Redmond*, 2024 IL 129201, 248 N.E.3d 1026. But a case decided in 2024 could not have put the officers on notice that their conduct in 2022 ran afoul of the Constitution.

## IV. *Monell* and Other Claims

Plaintiffs also bring other claims: namely, a claim against the City of Chicago for supervisory liability pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), and multiple failure-to-intervene claims against various CPD officers who were on the scene during the above-described events. Both of these claims are dependent on an underlying constitutional violation. *See Avina v. Bohlen*, 882 F.3d 674, 679 (7th Cir. 2018) (*Monell* claims); *Gill v. City of Milwaukee*,

850 F.3d 335, 342 (7th Cir. 2017) (failure to intervene). Because the court enters summary judgment in Defendants' favor on the underlying constitutional claims, the *Monell* and failure to intervene claims must fail.

## **CONCLUSION**

Plaintiffs contend that a minor traffic violation does not merit a stop, search, or brief handcuffing. But there are no disputes of material fact concerning the events of January 27, 2022, and the officers' conduct did not violate the Constitution. Defendants' motion for summary judgment [51] is granted. Plaintiffs' motion for summary judgment [54] is denied. The Clerk is directed to enter final judgment in favor of Defendants and against Plaintiffs.

ENTER:

Dated: September 3, 2026

REBECCA R. PALLMEYER
United States District Judge